**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MID-AMERICA AG NETWORK,<br>INC., a Kansas Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 02-CV-105-EA (C)** |
| MONKEY ISLAND DEVELOPMENT | ) | |
| AUTHORITY, an Oklahoma public trust, | ) | |
| | ) | |
| Defendant. | ) | |

**SPECIAL APPEARANCE BY THE FEDERAL AVIATION ADMINISTRATION**
**AND MOTION TO VACATE MARSHAL'S SALE**
**OR, ALTERNATIVELY, TO RECOGNIZE FEDERAL INTERESTS TO BE**
**PRESERVED IN THE MARSHAL'S SALE**

COMES NOW, the Federal Aviation Administration ("FAA"), by and through David E. O'Meilia, United States Attorney for the Northern District of Oklahoma and Cathryn McClanahan, Assistant United States Attorney. The FAA appears specially in this case to object to the pending Marshal's sale, which fails to account for or even recognize significant federal restrictions and interest on the subject property.

On November 24, 2004, the Clerk of the United States District Court for the Northern District of Oklahoma entered a General Execution and Order of Sale With Appraisement in this matter (Dkt. # 71), directing the United States Marshal to levy upon and sell Grand Lake Regional Airport ("Airport") located in Delaware County, Oklahoma. The District Court Clerk entered the Execution and Order of Sale to satisfy a judgment for attorney's fees in favor of Mid-America AG Network granted in the above lawsuit totaling $99,353.00 together with interest at the statutory amount from October 7, 2003. The U.S. Marshal set the sale for May 19, 2005 (Dkt. # 75, 76, 77 and 78).

I.    **THE PROPERTY INCLUDED IN THE U.S. MARSHAL'S SALE IS SUBJECT TO
      CERTAIN TERMS AND CONDITIONS UNDER REGULATION AND THROUGH
      GRANT AGREEMENTS.**

Monkey Island Development Authority ("MIDA"), an Oklahoma Public Trust, owns the

Airport (formerly Shangri La Airport) and holds it in trust for Delaware County, Oklahoma.  The

Airport is included in the National Plan of Integrated Airport Systems ("NPIAS").  The NPIAS is

the plan for developing public-use airports and includes information on the kind and estimated cost

of eligible airport development the Secretary of Transportation considers necessary to provide a safe,

efficient, and integrated system of public use airports adequate to anticipate and meet the needs of

civil aeronautics, national defense and the United States Postal Service.  In 1994, MIDA and

Delaware County (also "Sponsors") applied to the FAA for federal grant-in-aid money to purchase

the Airport.  MIDA purchased the Airport in November 1994 using federal grant-in-aid money in

the amount of $630,000.00 provided by the FAA under 49 U.S.C. § 47101 et seq. (formerly the

Airport and Airway Improvement Act of 1982, as amended).[1]  See Exhibit A, attached hereto.  In

September 2002, MIDA and Delaware County made another application for grant money to install

a perimeter fence at the Airport.  The FAA issued a grant to the Sponsors in the amount of

$167,625.00.  See Exhibit B, attached hereto.  As indicated on the face of both Exhibit A and Exhibit

B, these Agreements were filed with the Delaware County Clerk.

Funds for Airport Improvement Program (AIP) grants come from the Airport and Airway

Trust Fund, which was created by statute and is funded through user fees and ticket taxes.  Both of

these grants were "state apportionment grants" meaning they were part of non-discretionary money

---

[1] In 1994, federal aviation statutes, including the Airport and Airway Improvement Act of 1982, were codified into Title
49 of the United States Code.

2

apportioned by Congress under 49 U.S.C. § 47114(d).[2]

Under the statutory scheme, the FAA may approve a grant application only if it receives written assurances with respect to the use of the funds and the airport.[3]  These written assurances are in the form of the Sponsor Assurances that mirror the statute.[4]  They are included in each grant application and become a part of the grant.   The Assurances are extensive and cover the administration of the project for which the grant was awarded as well as the future operation of the airport.  In return for receiving these grant monies, MIDA and Delaware County contracted with the FAA assuring not to "sell, lease, encumber, or otherwise transfer or dispose of any part of [the] title or other interests" in the Airport without the approval of the Secretary of Transportation.[5]

In addition to these grant assurances, federal regulation governing federal grants also required that MIDA and Delaware County not dispose of the Airport or encumber the title and further obligated the Sponsors to use the property for the originally authorized purposes.[6]  The grant assurance obligation under the grant to purchase the Airport runs in perpetuity; the grant assurance obligation under the grant to install the perimeter fence remains in effect throughout the useful life of the fence, but no longer than twenty (20) years.  In return for these federal grants, MIDA and Delaware County were statutorily mandated to keep the Airport "available for public use."

---

[2]  Congress apportions money each year for airport development and improvement.  These funds fall into non-discretionary and discretionary categories. 49 U.S.C. § 47114(d) dictates how non-discretionary funds are to be applied. The statute provides a formula, based on population, for determining how much of the non-discretionary funds will be spent for general aviation airports in each state.

[3]  49 U.S.C. § 47107

[4]  Grant Assurances can be viewed http://www.faa.gov/arp/pdf/assrnap.pdf.

[5]  Grant Agreement Part V section 5. b.

[6]  49 C.F.R. § 18.31(b)

## II.   THE UNITED STATES' EQUITABLE LIEN SHOULD BE RECOGNIZED AND PROTECTED.

It is the position of the FAA that the pending sale of the Airport is:  (1) contrary to contractual obligations governed by federal law; (2) in violation of federal statute and regulation; and (3) contrary to public policy.  The FAA's substantial supervisory interest in protecting the public's interest in the Airport created an "equitable lien" in its favor in the Airport property. American Products Co., Inc. v. Mangless, 387 F. Supp. 744 (E.D. Okla. 1974) ("An equitable lien is recognized in Oklahoma." (citations omitted)).  Although grant agreements have a contractual aspect, they cannot be viewed in the same manner as a bilateral contract governing a discrete transaction.  Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.  Bennett v. Kentucky Dep't of Education, 470 U.S. 656, 669 (1985).  Congress' policy in legislating the airport grant program is to maintain a safe and efficient nationwide system of public-use airports that meets the present and future needs of civil aeronautics.  See 49 U.S.C §§ 47104 and 47107(a)(1).

A review of the statutory scheme of 49 U.S.C. § 47107 and the legislative histories of the grant agreement enactments show that these grant assurance provisions were designed to ensure the continued existence of an efficient, competitive, national air transport system.  Pollnow v. Hinson, Adminstrator of the Federal Aviation Administration, 1999 WL 38586 (7th Cir.); see also Congressional "Declaration of Policy" for the Airport Improvement Act of 1982, Legislative History P.L. 97-248, 1982 U.S. Code Congressional and Administrative News at p. 1461 ("the safe operation of the airport and airway system will continue to be the highest aviation priority; that the continuation of airport and airway improvement programs, including both development and planning

4

activities, and more effective management and utilization of the Nation's airport and airway system are required to meet current and projected growth in aviation.").

Contrary to contract and regulation, MIDA intentionally encumbered the Airport in direct violation of its contractual and regulatory obligations through execution of various notes and mortgages including:  (1) a mortgage dated May 25, 2002, in favor of the Breakers LLC to secure payment of a promissory note in the sum of $25,000.00 for property within airport boundary, but not purchased by AIP money[7], and (2) a mortgage dated on or about July 28, 1999, in favor of Mid-America AG Network, Inc, to secure payment of a promissory note in the amount of $185,000.00. These notes and mortgages were given without the consent or knowledge of the FAA.  MIDA also intentionally encumbered the Airport in direct violation of its contractual and regulatory obligations by executing various long-term leases with various tenants as follows:  (1) a ground lease in favor of Mid-America Ag Network dated December 1, 1997, with renewal options up to August 31, 2032; (2) a lease in favor of Island Enterprises dated May 5, 1999, with renewal options up to March 21, 2033; (3) a 30-year lease in favor of Paul W. and Barbara Staten having a commencement date of October 1, 1999, and (4) a lease in favor of Gerald R. Hale, Janie B. Hale, Gary M. Freeman, and Jill D. Freeman.  These leases were executed without the consent of the FAA.  Additionally, MIDA allowed (or even created) circumstances that resulted in judgment liens against the Airport one of which is the basis for the foreclosure action herein.

Encumbrances on title and use of airport property for non-aeronautical use without FAA concurrence in advance are in direct violation of the airport sponsor grant assurance obligations. The degree to which the statutes, regulations, and grant assurances limited or restricted MIDA and Delaware County's control over the Airport evidence a Congressional intent to protect the

---

[7] Property is depicted on the airport layout plan and is bound by grant assurances.

taxpayer's investment in the airport property through a theory of "equitable lien."  In addition to the Sponsors' obligations not to encumber the Airport without the express permission of the FAA and to keep the Airport open for public use, they were required to:  (1) submit annual or special financial and operations reports to the FAA upon request;[8] (2) maintain an airport layout plan acceptable to the FAA subject to change only upon approval of the agency;[9]  (3) expend airport revenue only for the capital or operating costs of the Airport or facilities serving the Airport,[10] and (4) submit to audits to allow the FAA to review their funding activities upon request.[11]  Additionally the FAA has the right to:  (1) conduct inspections to ensure compliance with assurances, regulations, and law;[12] (2) withhold funding for future airport projects in the event of violation of assurances or regulations,[13] and (3) apply to the appropriate U.S. District Court to enforce obedience to the grant assurances, laws, and regulations pertaining to airport grants.[14]  In the event the Airport were to no longer be used as an airport, the property would have to be disposed of at fair market value and the proportional share of the proceeds remitted to the FAA or, upon approval of the FAA, apply the funds to another grant-eligible project at the airport.[15]

This rigorous federal oversight evinces a strong agency supervisory interest in the Airport in preserving the coherence and integrity of the aid-to-airport grant scheme.  Such minute oversight

---

[8]  49 U.S.C  § 47107(a)(15)

[9]  49 U.S.C. § 47107(a)(16)

[10]  49 U.S.C. § 47107(b)(1)&(2)

[11]  49 U.S.C. § 47107(m) and § 47121

[12]  49 U.S.C. § 47122

[13]  49 U.S.C. § 47111(e)

[14]  49 U.S.C. § 47111(f)

[15]  49 U.S.C. § 47107(c)

over grant recipients and their performance has been held weighty enough to exclude the grantee's property acquired with grant funds from a bankruptcy estate. See Westmoreland Human Opportunities v. Walsh, 246 F.3d 233 (3d Cir. 2001); In re Joliet-Will County Community Action Agency, 847 F.2d 430 (7th Cir. 1988) (federal moneys and personal property fell outside the 11 U.S.C. § 541 definition of bankruptcy property and remained the property of the federal government). Where the federal government has a substantial interest in property purchased with grant funds, the use of property cannot be used to pay creditors. Westmoreland, 246 F.3d at 244 (property withheld from bankruptcy estate to pay creditors).[16]

In the instant matter, the statute and the grant agreement are clear in that they do not permit the use of AIP funds for any purpose other than the projects for which the funds were granted. Section 47110, defines allowable project costs as costs "necessarily incurred in carrying out the project in compliance with the grant agreement made for the project" incurred after the grant agreement is executed, if the cost is reasonable, not the subject of other government assistance, and if the total cost does not exceed the amount stated in the grant agreement.[17] The grant agreement contains conditions that reinforce the statutory prohibition on the payment of creditors with AIP funds. As a condition of the grant, the sponsor must take all steps to recover federal funds spent fraudulently, or otherwise misused.[18] The property may not, then, be used to pay creditors whose debts were not "necessarily incurred in carrying out the project in compliance with the grant agreement made for the project."[19]

[16] Contrary holding in Premier Airways v. DOT, FAA, 303 B.R. 295 (Bankr.W.D.N.Y. 2003). Bankruptcy Judge held that Chapter 7 trustee's interest as a "bona fide purchaser" in real property acquired by debtor under an AIP grant was superior to unrecorded interest of the FAA on a constructive trust or equitable lien theory.

[17] 49 U.S.C § 47110

[18] See Condition 7 of Grant Agreement

[19] 49 U.S. C. §47110(b)(1) "Allowable project cost".

7

**III.    THE MARSHAL'S SALE MAY IMPACT THE PUBLIC POLICY THAT THE FAA IS CHARGED WITH PROTECTING.**

A primary issue of concern for the FAA is related to the availability of the airport for public use. Under the grant assurances, airport sponsors are required to obtain FAA consent to use airport property for other than aeronautical purposes; this obligation extends to the use of airport lands acquired with Federal assistance as well as airport lands depicted on the airport layout plan.  FAA consent is required before executing proposed property transfers, granting easements or any development rights, or executing leases for non-aeronautical use.  Under its Federal obligations, airport sponsors must not cause or permit any activity or action that would interfere with the intended use of the airport for aeronautical purposes.  In general, the FAA has an interest in ensuring that any lease, property transfer, easement or use will not adversely affect the Federal investment in the development, improvement, operation, or maintenance of the airport.  Obtaining the required FAA concurrence before a sponsor permits airport property to be used for non-aeronautical purposes ensures that the non-aeronautical use does not act to restrict or undermine the utility of the Federal investment in the airport.

The substantial federal interest in the integrity and coherence of the aid-to-airports grant program; the FAA's rigorous statutory oversight of the Sponsors' use and administration of the Airport coupled with Congress' expressed intent to maintain a safe and efficient nationwide system of public-use airports that meets the present and future needs of civil aeronautics through the aid-to-airports created an equitable lien in the Airport in favor of the Government not subject to foreclosure by the Sponsors' creditors.

**IV.    THE MARSHAL'S SALE SHOULD BE VACATED OR, AT THE LEAST, THE COURT SHOULD MODIFY THE ORDERED SALE TO SPECIFICALLY RECOGNIZE, AND MAKE ANY SALE SUBJECT TO, THE FEDERAL INTEREST IN THE PROPERTY.**

While the FAA has no interest in litigating the underlying judgment in favor of the Plaintiff in this matter, the execution of the judgment should be vacated to the extent lands subject to Federal regulation and obligation are involved.  The Notice of Sale issued by the United States Marshal makes no notice of these important federal interests.  The Order of Execution should be vacated and modified to reflect the interests set out above.  Alternatively, the Court should enter an Order recalling all notices of sale.  An amended notice of sale should make absolutely clear that the federal interests described herein will not be compromised by any sale to satisfy the judgment of the Plaintiff.

Respectfully submitted,

DAVID E. O'MEILIA
United States Attorney


/s/Cathryn D. McClanahan
CATHRYN D. MCCLANAHAN, OBA #14853
United States Assistant Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
Telephone (918) 382-2700
Facsimile (918) 560-7939

OF COUNSEL:
ERIC E. ANDERSON
LORETTA BARLOW
Office of General Counsel
Federal Aviation Administration
2601 Meacham Blvd., Room 663
Forth Worth, Texas 76137
Telephone (817) 222-5078

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2005, I electronically transmitted the foregoing SPECIAL APPEARANCE BY THE FEDERAL AVIATION ADMINISTRATION AND MOTION TO VACATE MARSHAL'S SALE OR, ALTERNATIVELY, TO RECOGNIZE FEDERAL INTERESTS TO BE PRESERVED IN THE MARSHAL'S SALE to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kenneth M. Smith                                    Robert P. Skeith
ksmith@riggsabney.com                         Rskeith@riggsabney.com
Attorney for Plaintiff                               Attorney for Plaintiff

Kevin Behrens
kevin_behrens@oag.state.ok.us

I hereby certify that on May 11, 2005, I served the foregoing SPECIAL APPEARANCE BY THE FEDERAL AVIATION ADMINISTRATION AND MOTION TO VACATE MARSHAL'S SALE OR, ALTERNATIVELY, TO RECOGNIZE FEDERAL INTERESTS TO BE PRESERVED IN THE MARSHAL'S SALE by mail, proper postage paid, on the following who are not registered participants of the ECF System:

Michael C. Turpen
Riggs, Abney, Neal, Turpen, Orbison & Lewis
Paragon Building, Suite 101
5801 Broadway Extension
Oklahoma City, Oklahoma 73118-7489
Attorney for Plaintiff

David L. Crutchfield
56558 East Highway 125
Monkey Island, Oklahoma 74331
Attorney for Defendant

/s/Carie McWilliams
CARIE MCWILLIAMS
Legal Assistant