**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| MID-AMERICA AG NETWORK,<br>INC., a Kansas Corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>MONKEY ISLAND DEVELOPMENT<br>AUTHORITY, an Oklahoma public trust,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                                    Case No. 02-CV-105-EA (C)

<u>RESPONSE OF UNITED STATES TO INTERVENORS PAUL STATEN
AND ISLAND ENTERPRISES, INC.'S OBJECTIONS TO ORDER OF
MAGISTRATE AND BRIEF IN SUPPORT</u>

COMES NOW, the Federal Aviation Administration ("FAA"), by and through David E.

O'Meilia, United States Attorney for the Northern District of Oklahoma, and Cathryn D.

McClanahan, Assistant United States Attorney, and submits this response to Intervenors Paul Staten

and Island Enterprises, Inc.'s Objections to Order of Magistrate and Brief in Support (Dkt. #127),

filed August 23, 2005.

**I.      The fact that MIDA no longer purports to hold any interest in the property which is
to be sold to satisfy MIDA's debt justifies vacating the sale.**

Mr. Staten seems to assume that the fact that the judgment debtor in this case, Mokney Island

Development Authority ("MIDA"), no longer has any interest whatsoever in the subject property

is no impediment to a Marshal's sale of that property.  Oklahoma's "long established" law is that

"the purchaser at a sheriff's sale is not an innocent purchaser" and can only take whatever interest

a judgment debtor may have in property. *Sarkeys v. Russell*, 309 P.2d 723, 726 (Okla. 1957).  That

case involved a judgment rendered in the Northern District of Oklahoma federal district court

against defendant Russell.  The federal plaintiff (Mid Continent Petroleum Corp.) then executed

against certain property of the defendant and a sale by the U.S. Marshal resulted, with the successful

bidder being Sarkeys.  A third-party claimant to the land brought an action after the sale to claim

some right or title in the land.  In considering the claim, the Oklahoma Supreme Court stated:

"[T]he **[purchaser at the Marshal's sale] takes only such interest as the judgment debtor**

**possessed; so that if the judgment debtor has nothing, the purchaser acquires nothing.**"  *Id.*

(emphasis added) (citing *Goldenstern v. Gavin*, 102 P.2d 582 (Okla. 1940)).

Here, the General Execution signed by this Court specifically directed that the Marshal to

"cause the **equity** in the [property described in the General Execution] of said Defendant, Monkey

Island Development Authority" to be sold.  Dkt. #71 at p. 4 (emphasis in the original).  If the

judgment debtor has no interest in the property whatsoever (let alone equity), any attempt to push

the sale forward is nothing more than urging the Court to sell nothing.  As in the *Sarkeys* case, it is

one situation to find out that the debtor had no interest after the sale and only in the midst of a later

state court action; here, the Court has been made aware that the debtor "has nothing" so far as equity

in the property at issue and, consequently, the "purchaser [will] acquire[] nothing" at the Marshal's

Sale.  *Id.*  To hold such a sale – inviting the public to bid, knowing the winning bidder will acquire

"nothing" – is unconscionable.

The General Execution and Order of Sale (Dkt. # 71) created nothing more than an *in*

*personam* judgment against the Defendant.  It ordered the Marshal to satisfy the debt through any

assets and, as a last resort, to commence with the sale of certain real property.  The U.S. Supreme

Court states that an "execution" which is "general in its direction" and which "command[s] the

sheriff to make the costs out of any property of the defendant" is one that "**must . . . be treated as**

**a judgment *in personam* . . . .**"  *Freeman v. Alderson*, 119 U.S. 185, 190 (1886)(emphasis added).

2

Oklahoma cases support that position. *First Nat'l Bank and Trust of Vinita v. Kissee*, 859 P.2d 502, 505 (Okla. 1993) (award of fees and costs is an *in personam* judgment); *McNeal v. Baker*, 274 P. 655 (Okla. 1928) (*in personam* judgment allows general execution, judgment *in rem* is "confined to the proceeds arising out of the sale of the mortgaged property."); *see also, T.J.K. v. N.B.*, 237 So. 2d 592, 594 (Fla. App. 1970) (*in personam* judgment allows for general execution; *in rem* judgment imposes no personal liability).[1]  The judgment's *in personam* character is significant because only an *in rem* judgment vests rights to specific property in the judgment creditor. *See* 49 C.J.S. Judgments § 12 (updated 6/2005) ("A judgment in rem is an adjudication pronounced on the status of some particular subject matter, while a judgment in personam is in form and substance between the parties claiming the right in controversy and does not directly affect the status of the res.")

If the Plaintiff obeys the instructions of the Magistrate Judge, the frivolity of Mr. Staten's argument will be apparent.  An *in personam* judgment, giving rise to general execution against the assets and equity of MIDA, will memorialize the attorneys fees and cost due to Plaintiff.  Mr. Staten would then have property in which MIDA claims to have no interest whatsoever sold to satisfy that judgment.

## II.  Staten's proposal to simply draft a new Notice of Sale, which would conflict with the Court's General Execution Order is improper.

---

[1]Oklahoma recognizes that these sorts of *in personam* judgment are very different from judgments which are *in rem*. *Anderson v. Barr*, 62 P.2d 1242 (Okla. 1936).  In the *Anderson* case, the court discussed the very special nature of mortgages in our economy and the special interest created by mortgages:  "A mortgage on real estate creates in the mortgagee a vested property right in the premises, the value of which is in proportion to the amount which the mortgage bears to the value of the real estate . . . ." *Id.* at 1242 (syllabus by court).  There is an important difference between a general execution order and a mortgage foreclosure action.  New Mexico's Supreme Court cautioned parties against equating the two supplementary proceedings (execution in aid of judgment versus a foreclosure on a mortgage or note).  *Heimann v. Adee*, 924 P.2d 1352, 1356 (N.M. 1996).

3

The Notice of Sale is drafted by the Party causing the Execution to be issued.  12 O.S. § 764. To become effective, Oklahoma statutes requires that the Notice of Sale be executed by the sheriff (or in this case, the Marshal).  If the Notice of Sale were different than the Order of this court (which is the authority for the Marshal to conduct any sale), the Marshal would be unable to sign the amended Notice of Sale.  The Marshal would exceed his power by, in effect, selling property different from the property described in the Order of Sale issued by the Court.  A purchaser at a court-ordered sale can only purchase that which the court has ordered to be sold.  *Settles v. Atchison, T. & S. F. Ry. Co.*, 318 P.2d 867, 869 (Okla. 1957).

Moreover, if the Marshal were to receive a Notice of Sale which now recognizes the extinction of any equitable interest in the property by the judgment debtor, he could rightfully refuse to proceed against the property.  12 O.S. § 755.  When the Notice of Sale is drafted and presented to the sheriff (or Marshal), the Marshal "ha[s] the right to rely on the statement of the judgment debtors that they did not own the property in question" in failing to conduct the requested sale. *Riddle v. Bishop*, 79 P.2d 801, 803 (1938).  Mr. Staten himself acknowledges that MIDA is no longer the record title holder for any interest in the subject property.  Dkt. #127 at p. 5.

### III.    Mid-America never created or attached any lien on federal airport property.

Apparently, Mr. Staten is contending that he (or Mid-America) attached liens to the airport property by way of judgments against MIDA.  Of course, Mr. Staten's liens or judgments regarding MIDA are wholly irrelevant *here* – the only issue is Mid-America's ability to execute on airport property.  However, it is clear that, "under Oklahoma law a judgment lien attaches only to real property owned by the judgment debtor."  *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 432 (10th Cir. 1979).  "[P]roperty purchased with federal grant funds constitutes federal property" and

4

is not subject to attachment, execution or sale to satisfy the judgment creditor in this matter or Mr. Staten. *Neukirchen v. Wood County Head Start Inc*., 53 F.3d 809, 811 (7th Cir. 1995).

In *Neukirchen*, a creditor with a $87,275.02 employment discrimination judgment against the Wood County Head Start organization moved for writ of execution against the County's property. Wood County and the United States argued that property purchased in whole or part with federal funds could not be attached. The Court held that "*property purchased with federal grant funds constitutes federal property*" and was not subject to execution and sale to satisfy the judgment creditor. *Neukirchen*, 53 F.3d at 811.

The Court explained that there were "stringent regulations governing the disposition of property purchased with federal funds," citing Title 45 of the Code of Federal Regulations, sections 74.32 (real property), 74.34(equipment), and 74.35 (supplies). *Id.*, 53 F.3d at 813. Section 74.32 of the HHS regulations *mirrors FAA regulations*, also governing disposition of property purchased with federal funds, found at 49 C.F.R. § 18.31. The Seventh Circuit concluded that the regulations created a federal interest sufficient to prevent the judgment creditor, Neukirchen, from attaching to the grant-funded property. In fact, the federal interest actually rendered the property "federal property," such that sovereign immunity would prohibit the judgment creditor proceeding against the property. *Id*., 53 F.3d at 814.

Applying *Neukirchen* to the instant situation, the airport property purchased pursuant to a federal grant is "federal property" and not subject to attachment or executions by Mr. Staten (or, more importantly, by Mid-America). If the property is to be alienated or disposed of in some manner, the Secretary insists on compliance with 49 C.F.R. § 18.31.[2]

---

[2]Title 49 C.F.R. § section 18.31 is discussed and quoted more fully below.

The judgment creditor in the *Neukirchen* case certainly presented a compelling reason to allow execution – she had obtained a judgment finding that Wood County had discriminated against her based on age.  "Yet, Wood County has escaped the cost of its illegal discrimination because its federally funded assets cannot be attached and because the Secretary has apparently refused to terminate Wood County's funding as a consequence of the violation."  *Id*., 53 F.3d at 814. Similarly, Mr. Staten may present a compelling reason why he (or Mid-America) would prefer to execute against MIDA's interest in the airport, but the property is simply not subject to attachment and execution.

**IV.    Staten ignores explicit federal regulation and Grant Assurances which limit the disposition of the airport.**

**A.    Explicit federal regulations limit the manner in which the airport may be transferred from MIDA.**

At page 16 of his brief, Mr. Staten contends that the government's position must fail because there are no explicit conditions related to the grant agreement and the grant property that would prohibit the proposed sale by the U.S. Marshal.  Nothing could be further from the truth.  Both by way of regulation and by way of the Grant Assurances (to which Mr. Staten agreed to be bound), the government has explicitly and strictly limited the conditions under which the airport property may be removed from MIDA's control and custody.

Title 49 C.F.R. § 18.31, entitled "Real property", reads in part (with emphasis added):

(b)     Use.  Except as otherwise provided by Federal statutes, *real property will be used for the originally authorized purposes as long as needed for that purposes, and the grantee or subgrantee shall not dispose of or encumber its title or other interests*.

(c)     Disposition.  When real property is no longer needed for the originally authorized purpose, the grantee or subgrantee will request *disposition instructions from the awarding agency*.  The instructions will provide for one of the following alternatives:

6

1.      Retention of title.
        * * *
2.      Sale of property.  Sell the property and compensate the awarding agency.  The amount due to the awarding agency will be calculated by applying the awarding agency's percentage of participation in the cost of the original purchase to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses.  If the grant is still active, the net proceeds from sale may be offset against the original cost of the property.  When a grantee or subgrantee is directed to sell property, sales procedures shall be followed that provide for competition to the extent practicable and result in the highest possible return.
3.      Transfer of title.  *Transfer title to the awarding agency or to a third-party designated/approved by the awarding agency.* The grantee or subgrantee shall be paid an amount calculated by applying the grantee or subgrantee's percentage of participation in the purchase of the real property to the current fair market value of the property.

This regulation contains explicit limitations on the transferability of the airport property funded by the federal grant program.  There are only three manners in which the grant property may be disposed of and the Secretary is to make the decision about which shall apply to any particular airport.  Moreover, there is absolutely no option for transference by way of a Marshal's sale.

Any disposal is expressly conditioned on a finding that the property is no longer needed for the originally authorized purpose.  49 C.F.R. § 18.31 (c).  The Program Narrative, attached to and made part of the Grant Agreement specifically sets out the objective of all parties: to operate the airport "as a public-use facility."  Program Narrative of the Grant Agreements (attached as Exhibit A to Dkt. 81).  Neither MIDA, the agency, Mr. Staten nor Mid-America has ever contended, much less established, that this property is no longer needed for this originally authorized purpose.

The cited regulation is also important insofar as it creates a specific condition regarding the use of the property.  Title 49 C.F.R. § 18.31(b) provides that "real property will be used for the originally authorized purposes as long as needed for that purposes, and the grantee or subgrantee

7

shall not dispose of or encumber its title or other interests."  The property is dedicated to a specific use and, further, the property may not be disposed of as long as the property is needed for that purpose.  In effect, there is a restrictive covenant which limits the use of the land in question. Oklahoma law will recognize such a covenant, so long as the intention of the parties in their creation is clear.  *Moore v. White*,  323 P.2d 352,  354 (Okla. 1958).

**B.      The Grant Agreement – to which Mid-America voluntarily agreed to be subject – similarly explicitly limited the transferability of the subject airport property.**

Similar restrictive covenants are expressed in Grant Assurance C.31.[3]  It should be noted that Mr. Staten and his entities have voluntarily agreed to be bound by the Grant Assurances.  See *Mineta v. Delaware Co., et al.*, No. 05-CV-297-Ea, Dkt. # 21 at pgs. 5-6.  Likewise, Mid-America executed a Ground Lease and Commercial Facility Agreement with the following provision:

> In addition, the Lessee [Mid-America] further **acknowledges and agrees that it shall be subject to the provisions** of all existing or future agreements entered into between the Authority [MIDA] and the FAA or the OAC, and any other governmental agencies to obtain state, federal or other aid for the improvement or operation and maintenance of the Airport.  In connection herewith, the parties acknowledge that the Authority has furnished to the Lessee and the Lessee has reviewed copies of all such agreements entered into by the Authority as of the Effective Date of this Agreement, and the Authority agrees to furnish the Lessee with a full, true and exact copy of all such future agreements.

---

[3]Section C.31 of the Grant Agreements (attached as Exhibits A and B to Dkt. 81) reads in part:

b.        (1) For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land.  . . . .
(2) Land shall be considered to be needed for airport purposes under this assurance if (a) it may be needed for aeronautical purposes . . ., and (b) the revenue from interim uses of such land contributes to the financial self-sufficiency of the airport.  . . . .

c.        Disposition of such land under (a) or (b) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

Ground Lease and Commercial Facility Agreement at ¶ 45.1, dated December 1, 1998, attached as Exhibit B to Mid-America's Motion for Summary Judgment (Dkt. # 14) (emphasis added).

### C.   Besides these interests, principles of  preemption would prevent any Marshal's Sale of this airport property.

The referenced regulation (49 C.F.R. § 18.31) and Grant Assurance (C.31) created an interest akin to a restrictive covenant, which was clearly expressed by the parties.  Oklahoma law certainly allows for such an interest in land, as established above.   However, the airport property is additionally protected because federal regulation preempts all conflicting state law.

The Supreme Court has established that a federal agency may promulgate regulations which would preempt the normal operation of state law.  *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988).  An agency intends for a regulation to preempt a state law when a regulation conflicts with a state law.  *See generally Geier v. American Honda Motor Co.*, *Inc.*, 529 U.S. 861, 884 (2000). This conflict preemption occurs when it is impossible to comply with both state and federal law, and when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the relevant agency].' "  *See id.* at 873 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Here, the right of Mid-America (or Mr. Staten, for that matter) to exercise certain state-law based rights of execution directly conflicts with regulations governing the use and disposition of the same property.

Because Congress has detail limited the manner in which grant-funded airport property may be alienated, principles of federal preemption and supremacy endorse the Secretary's position in this matter.  "[I]t is entirely within the power of Congress to completely eliminate certain remedies by preempting state actions, while providing no substitute federal action . . . ."  *King v. Marriott Intern. Inc.*, 337 F.3d 421, 425 (2003).  Moreover, the regulations which safeguard the airport grant

9

program (49 C.F.R. § 18.31, for instance) preempt the course of action proposed by Mid-America. *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."). If a judgment creditor could avoid the mandate of 49 C.F.R. § 18.31, which gives the Secretary control over the disposition of airport property, the creditor would frustrate the very purpose of a statutorily authorized regulation. The doctrine of preemption prevents such a maneuver.

V.      **Staten improperly compares the rights of the Secretary in this case (which exist because of an airport grant program) to reversionary interests allowed in wholly separate sections of unrelated surplus property programs.**

The Magistrate in this matter specifically declined to decide the interest of the Secretary of Transportation in the subject property. The Magistrate purposefully limited the scope of his decision to the viability of the then-pending Marshal's Sale, as that sale had been urged by the judgment-creditor. As he decided that sale was not viable because of the manner in which the Execution and Order of Sale were crafted, he did not reach that issue. Staten's determination to argue that matter – not even addressed by the Magistrate – is improper. In any event, Mr. Staten's discussion relies entirely on irrelevant statutory citation and comparison.

Title 49 of the United States Code relates to the functions of the Department of Transportation. Subtitle VII of that Title relates to Aviation Programs and Part B relates to Airport Development. There are three subchapters to that Part: Subchapter I is the *Airport Improvement Program*; Subchapter II is the *Surplus Property for Public Airport Programs*; Subchapter III is a program for Aviation Development Streamlining. Despite the fact that the Grant Program at issue relates to (and all rights claimed by the Secretary have always cited to) the Airport Improvement

10

Program, Staten inexplicably repeatedly directs this Court's attention to the Surplus Property provisions of a wholly separate subchapter.  The airport in question was never surplus governmental property and never transferred according to that separate and distinct program.

Staten's discussion of the reversionary provisions of various irrelevant regulations and statutes is misguided, to say the least.  For instance, Staten cited to Section 16 of the Federal Airport Act which, he acknowledges, deals with transference of federally owned property for the use of a public airport.  Dkt. # 127 at pg. 20.  In that instance, the conveyance can specify that the property will automatically revert to the United States.  Those provisions have nothing to do with the grant agreement in this case.  The United States never had legal title to the subject property and it never declared the property as surplus and it never transferred title to any party.  The United States obviously claims no reversionary interest, as "reversion" would require a return to the United States of a previous interest that the United States was entitled to receive again.  *See* 60 Okla. Stat. § 29 ("The reversion is the residue of an estate left, by operation of law, in the grantor, or his successors, or in the successors of a testator, commencing in possession on the determination of a particular estate granted or devised.").

Staten's citations repeatedly miss the mark, invoking the "Surplus Property Act" (Dkt. # 127 at pg. 21) and a statute entitled "Surplus Property for Public Airports" (Dkt. # 127 at pg. 21, citing 49 U.S.C. § 47153).  These statutes and regulations prescribe the manner in which the *federal government* may alienate surplus federally-owned property for potential use as a airport.  The only issue in this matter is (and has always been) the manner in which property titled to *MIDA*, obtained by way of governmental grants, may be alienated for potential debt-cancellation.  This airport was never "surplus" governmental property, where a reversionary interest would be possible.

11

Staten conveniently ignores the true nature of the United States' interest.  The United States has an interest akin to a covenant or condition on alienation.  To be sure, the Grant Agreement and federal law allow for the alienation of the property at issue; however, the manner in which that may be accomplished is carefully limited.  In fact 49 C.F.R. § 18.31 (quoted at length above) first and foremost requires that disposition of the airport property acquired by way of a federal grant proceed only pursuant to instruction from the agency (the FAA).   The regulations and Grant Agreement, as noted above, create restrict covenant interests.

Staten also misapprehends the impact of 49 U.S.C. § 47111(f), apparently arguing that Congress was without power to eliminate a particular state law remedy or proceeding he would otherwise have available.   Actually, § 47111(f) simply allows the Secretary to seek the assistance of the Court in protecting federal interests and enforcing Grant Agreements and regulations related to the grant programs.  Congress, through 49 U.S.C. § 47111(f), empowered this Court to enter orders necessary to protect the federal interest.  A federal district court certainly has the jurisdiction and the power to enter whatever orders it may deem necessary to enforce federal regulations, protect federal interests and enforce the principles of preemption and federal sovereignty.  In other words, § 47111(f) is not the source of the federal interest; rather, it provides a mechanism for protection of the federal interests created elsewhere (such as in Grant Agreements or federal statute and regulation).

## VI.    The judgment creditor and judgment debtor have taken no appeal from the Magistrate Judge's Report and Recommendation.

The bizarre posture of this appeal cannot escape notice.  Mid-America, a judgment creditor drafted a General Execution and Order of Sale (Dkt. # 71) and the corresponding Notice of Sale of certain property of the judgment debtor, MIDA.  The United States, through the Secretary of

Transportation objected to any sale of MIDA property which was acquired with federal funds. (Dkt. # 80-81). In the interim, Mr. Staten and his entities extracted a settlement from MIDA whereby MIDA conveyed all interest in the federally funded airport to one of Mr. Staten's entities. *Staten, et al. v. Delaware Co., et al.*, No. 04-CV-504-E (J) at Dkt. # 127.[4] The Marshal's sale was then vacated by the Magistrate Judge because of the change in interest in the property, leaving for another day any determination of federal interest in the property.

Neither MIDA (the judgment debtor) nor Mid-America (the judgment creditor) has appealed the Magistrate Judge's Report and Recommendation. The Recommendation was based, in part, on concessions of Mid-America's counsel about the need to redraft the General Execution Order and the corresponding Notice of Sale. The only party to appeal the Report and Recommendation – asking the Court to push forward with a Marshal's sale – is the record title holder to the airport acquired with federal funds.

The Magistrate Judge made a reasoned decision, purposefully stopping short of deciding the issues which Mr. Staten now asks this Court to resolve. Both the judgment debtor and judgment creditor apparently have no quarrel with the Magistrate Judge's Report and Recommendation. The Court should affirm the decision of the Magistrate Judge.

―――――――――――

[4]On April 7, 2005, Mr. Staten and Island Enterprises clarified that they were only asking the Court for an order of monetary damages in various amounts. *Staten, et al. v. Delaware Co., et al.*, No. 04-CV-504-E (J) Dkt. #132. Plaintiffs, though their responsive pleading assured the Court, "**THERE IS NO ISSUE BEFORE THIS COURT AS TO THE TRANSFER OF ANY PROPERTY**". Id. at Dkt. #132, p. 3 (emphasis in original). With this assurance, the Court entered a monetary judgment only on May 3, 2005. Id. at Dkt. #141.

Respectfully submitted,

DAVID E. O'MEILIA
United States Attorney


/s/Cathryn D. McClanahan
CATHRYN D. MCCLANAHAN, OBA #14853
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1013
Telephone (918) 382-2700
Facsimile (918) 560-7939

OF COUNSEL:
ERIC E. ANDERSON
LORETTA BARLOW
Office of General Counsel
Federal Aviation Administration
2601 Meacham Blvd., Room 663
Forth Worth, Texas 76137
Telephone (817) 222-5078

14

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2005, I electronically transmitted the foregoing RESPONSE OF UNITED STATES TO INTERVENORS PAUL STATEN AND ISLAND ENTERPRISES, INC.'S OBJECTIONS TO ORDER OF MAGISTRATE AND BRIEF IN SUPPORT to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kenneth M. Smith                              Robert P. Skeith
ksmith@riggsabney.com                         Rskeith@riggsabney.com
Attorney for Plaintiff                        Attorney for Plaintiff

Kevin Behrens                                 Evan B. Gatewood
kevin_behrens@oag.state.ok.us                 Egatewood@hmglawyers.com
Attorney for Oklahoma Aeronautics  Attorney for Brawner Construction Co.
Commission

Jeb E. Joseph
jeb.joseph@sbcglobal.net
Attorney for Paul Staten

I hereby certify that on September 2, 2005, I served the foregoing RESPONSE OF UNITED STATES TO INTERVENORS PAUL STATEN AND ISLAND ENTERPRISES, INC.'S OBJECTIONS TO ORDER OF MAGISTRATE AND BRIEF IN SUPPORT by mail, proper postage paid, on the following who are not registered participants of the ECF System:

Michael C. Turpen
Riggs, Abney, Neal, Turpen, Orbison & Lewis
Paragon Building, Suite 101
5801 Broadway Extension
Oklahoma City, Oklahoma 73118-7489
Attorney for Plaintiff

Carl Hughes                                   David L. Crutchfield
Hughes & Goodwin                              56558 East Highway 125
5801 N. Broadway, Suite 302                   Monkey Island, Oklahoma 74331
Oklahoma City, Oklahoma 73118                 Attorney for Defendant
Attorney for Monkey Island Development
Authority

                                   /s/Connie Sullivent
                                   CONNIE SULLIVENT
                                   Paralegal Specialist

15